UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MASOUD SASANNEJAD,

                      Plaintiff,

                                                         DECISION AND ORDER

                                                         02-CV-6642L

                      v.

UNIVERSITY OF ROCHESTER,

                      Defendant.
_____

## INTRODUCTION

Plaintiff Masoud Sasannejad ("plaintiff") instituted this action *pro se* against his former employer, the University of Rochester ("the University" or "defendant"), alleging national origin and religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Plaintiff claims that he was terminated in December 2001, after the September 11, 2001 terrorist attacks, because he is Iranian and a Muslim. Before the Court is the University's motion for summary judgment brought pursuant to Fed. R. Civ. R. 56. (Dkt. #15). For the reasons that follow, the University's motion is granted and plaintiff's complaint is dismissed.

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Plaintiff was born in Iran and is a non-practicing Muslim. He moved to the United States when he was eighteen years old. In

1977, he received degrees in physics and electrical engineering from the University of Missouri. While in college, he worked at an engineering and research lab. After college, he worked for five years at Bell & Howell Company, first as a field engineer and then as a technical specialist. (Dkt. #16, Ex. 7, Pl. Dep., 5-15, 140, 143).

In 1982, plaintiff left Bell & Howard and moved to Rochester. He started his own business, RMCR Corporation, which he ran from 1982 until 2000. During this time, plaintiff (through his business) performed construction remodeling of residential houses and he purchased and managed a restaurant. At various times, RMCR employed as many as twenty-two employees at the restaurant. Plaintiff sold the restaurant and dissolved RMCR in 2000. (Pl. Dep., 15-20).

In April 2001, plaintiff began working at the University as a Senior Lab Technician for Dr. Michael Weliky in the Neurobiology Laboratory in the Brain and Cognitive Sciences Department. According to Weliky, plaintiff represented to him when interviewed that he had extensive experience in electrical and mechanical engineering, significant computer programming skills, and more relevant work experience than an average candidate.[1] Therefore, Weliky hired plaintiff at a higher salary ($30,000) than was originally budgeted for the position ($21,000). (Dkt. #17, ¶7).

Plaintiff was Dr. Weliky's only employee in the lab. Graduate student Chiayu Chiu and post-doctoral student Jozsf Fisher conducted studies in the lab at this time, but neither was considered an employee. (Dkt. #17, ¶8). For the first six weeks plaintiff was employed, Dr. Weliky was absent

---

[1] Weliky also contends that plaintiff lied to him during the interview and told him that RMCR was an engineering company with fifty employees that did engineering work. (Dkt. #17, Weliky Aff., ¶4). Plaintiff claims that he did not lie, and that he had engineering and electrical experience during his time with RMCR because he fixed "technical" equipment that broke down, such as an ice machine or cash register, and had experience wiring sound systems. (Pl. Dep., 31-32).

from the lab due to a death in the family and he did not observe plaintiff's performance. When Weliky returned, he found that plaintiff was not meeting his expectations. However, Weliky believed plaintiff's performance would improve with time. (Dkt. #17, ¶¶9-10).

According to Weliky, plaintiff's performance did not improve. He was not able to work independently. He demonstrated poor understanding of the basic research concepts and designs despite multiple explanations, and he repeatedly produced inadequate work product that Dr. Weliky had to correct. (Dkt. #17, ¶11). On one project, Dr. Weliky asked plaintiff to develop an electrode holder headset. After detailed discussions with plaintiff about the project, plaintiff presented headsets that were unusable and then did not understand why his designs would not work. Weliky also noted two incidents that occurred in August 2001. On one occasion, plaintiff improperly performed certain tests on amplifier modules, thereby invalidating the results. On another occasion, plaintiff made errors while preparing syringes for use in surgical procedures performed on animals in the lab. In October 2001, Weliky asked plaintiff to rework an existing electrode design. According to Weliky, after plaintiff worked on it for several days, he presented a design that was unusable because plaintiff had used an incorrect part. (Dkt. #17, ¶¶12-15). Weliky asserts that he addressed his concerns with plaintiff about his performance both during and after August 2001. Plaintiff, however, did not appear to recognize the nature and seriousness of his errors. (*Id.* at ¶16).

Plaintiff disputes that his designs were inadequate or that the errors described by Weliky were as serious as Weliky claims. (Pl. Dep., 61-64, 67-71). Plaintiff further asserts that his performance on projects was satisfactory and that, in fact, Dr. Weliky used his designs. (Pl. Dep., 84-85). He also claims that the job itself was not complicated and involved mostly ministerial or clerical duties, such

as carrying boxes, ordering materials, checking supplies, and preparing for experiments. To the extent there was any technical work, it was elementary in nature and plaintiff claims he was over-qualified to perform it. (Pl. Dep. 35, 59, 77, 110).

On or about November 8, 2001,[2] Dr. Weliky gave plaintiff a detailed written warning letter that informed plaintiff that his job performance had been inadequate, that his understanding of basic research design was poor, and that he needed more supervision than someone with his asserted background and experience. (Dkt. #17, Ex. 2). This warning letter advised plaintiff that he needed to improve his performance immediately and to demonstrate that improvement by completing a programming/design test in a one-week period. The letter also warned that plaintiff might face further disciplinary action, including termination, if he did not perform well. (*Id.*).

Plaintiff chose not to perform the one-week long project because he believed that the offer to improve his performance was not genuine. According to plaintiff, Dr. Weliky had already decided to terminate plaintiff, and had suggested to him as much sometime before November 8. (Pl. Dep., 72-74, 94, 188). Plaintiff claims that Dr. Weliky gave him the letter only upon the advice of the University's administration as to what procedure to follow in order to terminate him. (Pl. Dep., 82-83, 95-102). Thus, plaintiff believed engaging in the project would be futile because he was to be fired regardless of how he performed. Dr. Weliky maintains that the warning letter was a good faith offer to plaintiff to improve his job performance, and that he truly wanted plaintiff to succeed on the project. (Dkt. #17, ¶17).

---

[2] As with all University employees, plaintiff was initially placed on a six-month probationary period when he was hired. Plaintiff concedes that it is easier to fire an employee during this period. Plaintiff's six-month probationary period ended on October 31, 2001, a month and a half after the September 11 attacks. (Pl. Dep., 33, 88-90; Dkt. #17, Ex. 1, p.4).

According to Weliky, plaintiff chose to leave the University's employ instead of completing the project. Plaintiff claims he had no choice but to leave. On November 12, 2001, Dr. Weliky told plaintiff that his last day would be November 30. Plaintiff asked that he be allowed to stay through the end of the year in order to look for another position at the University. (Dkt. #17, ¶18; Pl. Dep., 96, 99, 105-107). Dr. Weliky agreed, and plaintiff's last day of employment was December 30, 2001. (Dkt. #17, ¶18).

## DISCUSSION

### 1. Summary Judgment in Discrimination Cases

When deciding a motion for summary judgment brought pursuant to Fed. R. Civ. P. 56, a court's responsibility is to determine whether there are issues to be tried. *Duse v. Int'l Bus. Machs. Corp.*, 252 F.3d 151, 158 (2d Cir. 2001). Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' . . . An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The general principles regarding summary judgment apply equally to discrimination actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)) (reiterating "that trial courts should not 'treat discrimination

differently from other ultimate questions of fact.'"). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).

I find that defendant is entitled to summary judgment. Plaintiff has failed to submit sufficient evidence to raise an issue of fact that the University's nondiscriminatory reasons for terminating him are not worthy of belief, or that Dr. Weliky terminated him because he was Iranian or a Muslim.

## 2. Pleading and Exhaustion of Religious Discrimination Claim

Plaintiff, proceeding *pro se*, filed a form complaint in which he placed a checkmark on the line alleging a claim of discrimination based on national origin. He did not place a checkmark on the line alleging religious discrimination. Plaintiff believed that when he completed the form complaint, checking national origin would be sufficient to cover both types of discrimination. According to plaintiff, national origin was a broader, "more general term" because most Iranians are Muslims. (Pl. Dep., 140).

I find that plaintiff has sufficiently asserted a claim of discrimination based on religion. The Court has an obligation to read *pro se* pleadings liberally and interpret them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). This principle

is particularly applicable in cases such as this where the plaintiff alleges a violation of his civil rights. *See, e.g., Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Although he did not place a checkmark next to "religion" on one part of his complaint, he asserts in a narrative section at the bottom of that same page that Dr. Weliky was Jewish and had lived in Israel, and began treating him differently once he learned that plaintiff was Muslim and born in Iran. (Dkt. #16, Ex. 5, p.4). In addition, his EEOC charge questionnaire contains references to religion. (*Id.* at p.2 of EEOC questionnaire). Further, the defendant has been on notice that plaintiff raised such a claim. It is clear from plaintiff's deposition testimony that discovery was conducted as to the nature of plaintiff's religious discrimination claim. Although defendant urges the Court not to read the complaint so broadly, it has addressed the merits of a religious discrimination claim in its motion for summary judgment.

The University next argues that any religious discrimination claim should be dismissed because plaintiff failed to exhaust his administrative remedies. Defendant points to the fact that plaintiff's charge of discrimination filed with the EEOC alleges that he was terminated due to his national origin only, and not his religion. (Dkt. #16, Ex. 3). I find that this fact is not dispositive of the issue and that, for purposes of this motion, I will assume that he has exhausted this claim.

It is well-settled that "[a] plaintiff may bring an employment discrimination action under Title VII . . . only after filing a timely charge with the EEOC . . . ." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82-83 (2d Cir. 2001); *Francis v. City of N.Y.*, 235 F.3d 763, 768 (2d Cir. 2000). However, a claim not contained in an EEOC charge may be filed in a federal court if the claim is reasonably related to those claims filed with the agency. A claim is reasonably related if the conduct

complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts v. City of N.Y. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993). "In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)).

Here, plaintiff completed an EEOC charge questionnaire in which he asserted discrimination based on national origin and religion. Plaintiff clearly states that, after the September 11 terrorist attacks, Dr. Weliky began treating him differently and then terminated him because he was born in Iran and a Muslim. (Dkt. #16, Ex. 5, at p.2 of EEOC charge questionnaire). In addition, in response to a request from an EEOC representative, plaintiff submitted a more detailed statement specifying his claims of discrimination. (Dkt. #16, Ex. 4). In this statement, plaintiff described an incident in which Dr. Weliky allegedly said that he was not "comfortable" working with plaintiff, and plaintiff responded by trying to downplay that he was Iranian and emphasized that he had had a Jewish roommate and had hired Jewish employees to work in his restaurant in the past. (*Id.*). Nevertheless, when the typewritten EEOC charge was completed a month and a half later, only the box next to "national origin" was checked. (Dkt. #16, Ex. 3).

A claim based on national origin discrimination is theoretically different from a claim based on religious or racial discrimination. Nevertheless, in certain circumstances, the two claims may be so interrelated as to be indistinguishable. *See Deravin*, 335 F.3d at 201 ("courts have also recognized that race and national origin discrimination claims may substantially overlap or even be

indistinguishable depending on the specific facts of a case."); *see also Sinai v. New England Tel. and Tel. Co.*, 3 F.3d 471, 475 (1st Cir. 1993) ("[R]ace and national origin discrimination may present identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group' ... [and thus] in certain circumstances ... national origin and race discrimination may overlap.") (quoting *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)); *Dennis v. Pan Am. World Airways, Inc.*, 746 F.Supp. 288, 291 (E.D.N.Y. 1990) (acknowledging that "[r]ace ... may sometimes be correlated with national origin because of certain historical or demographic facts").

Here, the religious demography of Iran is important. According to a publication of United States government, Iran is an Islamic Republic and ninety-eight percent of its population is Muslim. *See* the Central Intelligence Agency, The World Factbook 2004, found at http://www.cia.gov/cia/publications/factbook/geos/ir.html (last updated May 11, 2004). Thus, the line between discrimination based on Iranian national origin and the Islamic religion appears to be sufficiently blurred and the claims are reasonably related to one another. *Deravin*, 335 F.3d at 202; *Fraser v. N.Y. City Bd. of Educ.*, No. 96 Civ. 0625, 1998 WL 55170, at *4 (S.D.N.Y. Feb. 10, 1998) (assuming without deciding that claims of national origin, religion and color discrimination were reasonably related to claim of race discrimination where EEOC charge indicated that plaintiff was a "Hebrew Israelite.").

Moreover, based on the content of plaintiff's EEOC charge questionnaire and follow-up letter, it stands to reason that, while investigating whether Dr. Weliky discriminated against plaintiff because he is originally from Iran, the EEOC would also investigate whether Dr. Weliky

discriminated against plaintiff because he is a Muslim. In fact, plaintiff relies on the same alleged discriminatory conduct in support of both claims. *See Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 614 (2d Cir. 1999) (noting that the exhaustion requirement is "designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action . . . .") (internal quotation marks and citation omitted). Therefore, based on the facts of this case, I will assume, without deciding, that plaintiff's religious discrimination claim is reasonably related to his claim of national origin discrimination.[3]

## 3. Insufficient Evidence of Pretext or Discriminatory Animus

Plaintiff's discrimination claims must be analyzed pursuant to the familiar *McDonnell Douglas* burden-shifting rules. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff must first establish a *prima facie* case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory business rationale for its actions. "If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of

---

[3] Although defendant has cited other cases that have found that claims of national origin discrimination were not reasonably related to other claims of discrimination, including those based on race, it appears that each case is fact specific. *Compare Ige v. Command Sec. Corp.*, No. 99-CV-6916, 2002 WL 720944, at *5-*6 (E.D.N.Y. Mar. 12, 2002) (a claim of national origin discrimination is "wholly different" than a claim of race discrimination); *Mathura v. Council for Human Servs. Home Care Servs., Inc.*, No. 95-CV-4191, 1996 WL 157496, at *2 (S.D.N.Y. Apr. 2, 1996), *aff'd*, 107 F.3d 3 (2d Cir. 1997) (same), *with Deravin*, 335 F.3d at 202-203 (claim of race discrimination reasonably related to claim of national origin discrimination where African-American employee charged that Irish-American employees were treated preferentially); *Sharabura v. Taylor*, No. 03 CV 1866, 2003 WL 22170601, at *3 (E.D.N.Y. Sept. 16, 2003) (claim of race discrimination reasonably related to claim of national origin discrimination where Russian employees alleged that they were fired improperly and replaced with African-American employees).

fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

In the instant case, even assuming that plaintiff can establish a *prima facie* case of discrimination,[4] there can be no doubt that the University has advanced a legitimate, nondiscriminatory reason for Dr. Weliky's decision to terminate plaintiff. The University asserts that plaintiff did not perform the lab technician job satisfactorily. The University provided specific examples of plaintiff's inadequate performance on certain projects in the lab. This assertion is supported by the affidavits of Dr. Weliky and his graduate student Chiu. (Dkts. ##17, 20).[5] It is also supported by the November 8, 2001 written warning letter.

Plaintiff has failed to produce sufficient evidence that this proffered reason is false or is a pretext for Dr. Weliky's anti-Iranian or anti-Muslim animus. Plaintiff does not necessarily dispute that there was conflict between he and Dr. Weliky about his performance. Instead, he minimizes the

---

[4] To state a *prima facie* case of discrimination under Title VII based on national origin or religion, plaintiff must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold*, 366 F.3d at 152.

[5] Chiayu Chiu, a graduate student who currently works in Dr. Weliky's lab and who worked there when plaintiff was employed, states that plaintiff had difficultly understanding the projects Dr. Weliky gave him, and would often ask her for clarification and assistance. However, plaintiff had such a poor understanding of the engineering concepts in his work that he could not explain to her the assignments he had been given. He would then complete the projects incorrectly because he was afraid to ask Dr. Weliky for clarification. In Chui's opinion, plaintiff did not perform his job adequately and Dr. Weliky was genuinely displeased with the quality of plaintiff's work and his inability to work independently. In addition, she never observed Dr. Weliky treat plaintiff more critically or harshly than he treated her or his other students. Nor did she observe him exhibit any anti-Iranian or anti-Muslim sentiments. (Dkt. #20, ¶¶3-9).

significance of the incidents and claims that he was performing his job well. (Pl. Aff., Dkt. #24). Plaintiff's subjective opinion about his own performance, however, is insufficient to give rise to a triable issue of fact regarding pretext. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (plaintiff's personal belief regarding her own qualifications is inadequate to raise a triable issue of fact regarding motive of the employer for its employment action); *Viola v. Philips Med. Sys. of N.A.*, 42 F.3d 712, 718 (2d Cir. 1994) (an employee's disagreement with an employer's negative performance evaluation is not enough to support a discrimination claim).

Moreover, plaintiff has failed to offer any direct evidence of discriminatory actions by Dr. Weliky. Plaintiff points to one conversation he had with Dr. Weliky regarding his Iranian national origin. Plaintiff claims that Dr. Weliky found plaintiff's identification card and, while handing it back to him, noticed his full name printed on it.[6] Plaintiff claims that Weliky asked him "Is this an Indian name," to which plaintiff responded, "No, it's Iranian." According to plaintiff, Weliky then whispered "too bad." Even assuming that Dr. Weliky said this (something he disputes), this isolated comment is not sufficient evidence to defeat summary judgment. *Abdu Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Moreover, plaintiff could not recall any specific instance where he heard Dr. Weliky make any negative statements to him about Islam. (Pl. Dep., 142-43).

Plaintiff's theory that the decision to terminate him must have been made for a discriminatory reason, is not enough to overcome the University's showing. *See Wado v. Xerox Corp.*, 991 F. Supp. 174, 197 (W.D.N.Y. 1998), *aff'd sub nom. Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999); *see*

---

[6] Plaintiff appears to have been known in the lab as "Matt Sasan." That is the name to which Dr. Weliky addressed the warning letter. Plaintiff's full name is Masoud Sasannejad, and this is the name that appeared on his identification card.

*also Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."). Plaintiff relies primarily on his own speculation as to what was in Dr. Weliky's mind, and certain "impressions" he made from observing him. (*See, e.g.*, Pl. Mem., Dkt. #23; Pl. Dep., 74, 79-80). Plaintiff states that shortly after the September 11th tragedy, he felt that Dr. Weliky began treating him differently. For instance, at his deposition, plaintiff testified that he heard Dr. Weliky having a conversation with someone in which he stated that during the time that Weliky lived in Israel, he was concerned about the terrorist activities that took place in that country. (Pl. Dep., 79-80). Plaintiff inferred from this rather benign conversation that Dr. Weliky had some sort of discriminatory animus towards Muslims. This is pure speculation. Moreover, plaintiff has not identified any negative comments of Dr. Weliky about Muslims in general, or Iranians specifically. Instead, plaintiff stated "that would be in his mind." (Pl. Dep., 80; *see also* Pl. Dep., 74 ["I sensed that the – you know, he's being a little strange about – just acting a little different"]). Such speculation and conjecture, however, is insufficient to defeat summary judgment.

That plaintiff was fired two months after the September 11 terrorist attacks that were carried out by Islamic extremists is also not sufficient to establish a nexus between the decision to terminate him and his religion or national origin. The temporal proximity itself is not sufficient to show pretext. *See Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 211 n.28 (D. Conn. 2000), *aff'd* Fed. Appx. 38 (2d Cir. April 16, 2001) ("Generally, temporal proximity, standing alone, is insufficient to carry plaintiff's burden at step three of the *McDonnell Douglas* analysis. Courts in this circuit have typically required some additional evidence."). Further, such an inference is belied by

the fact that plaintiff was a probationary employee for almost six weeks after September 11. Seemingly, if Dr. Weliky had wanted to fire plaintiff because he was Iranian or Muslim, he could have done so during this probationary period. Additionally, plaintiff's performance issues arose before September 11. Dr. Weliky described two different incidents that occurred in August 2001 in which plaintiff made mistakes during certain testing and experimental procedures. (Dkt. #17, ¶¶13-14). This is not a case where there was a sudden change in an employee's performance evaluation following some precipitating event. Instead, plaintiff continued to make errors at work and, after being given an opportunity to correct his performance, he failed to do so, and was terminated.

Viewing all of the evidence in the light most favorable to the plaintiff, and reading *his pro se* opposition to summary judgment to raise the strongest arguments that it suggests, I find that no rational jury could conclude that the University's decision to terminate plaintiff was based on the fact that he was Iranian or a Muslim. Therefore, the University is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the University's motion for summary judgment (Dkt. #15) is granted, and plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       August 10, 2004